## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

MICHAEL J. THOMPSON,

       Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

       Defendant.

No. C05-3070-PAZ

**MEMORANDUM OPINION AND
ORDER**

---

## I. INTRODUCTION

The plaintiff Michael J. Thompson ("Thompson") seeks judicial review of a decision by an administrative law judge ("ALJ") denying his application for Title II disability insurance ("DI") benefits. Thompson claims the ALJ's hypothetical question to the Vocational Expert was not based on substantial evidence, and therefore the resulting response cannot constitute substantial evidence to support a denial of Thompson's application for DI benefits. (*See* Doc. No. 8)

## II. PROCEDURAL AND FACTUAL BACKGROUND

### A. Procedural Background

On January 28, 2003, Thompson filed an application for DI benefits, alleging a disability onset date of September 15, 1998. Thompson had filed a previous application for benefits in 2001, alleging the same disability onset date. The application was denied initially and on reconsideration, and Thompson did not appeal the decision. In filing his 2003 application, Thompson claims he is disabled due to neck and back problems and degenerative disc disease. He claims these conditions limit his ability to work because

"numbness in hands makes it difficult to pick up things, [and] because of back and legs [he] can only pick up small objects. It is hard to do anything at all." (R. 167)

Thompson requested a hearing, and a hearing was held before ALJ George Gaffaney on December 14, 2004. Thompson was represented at the hearing by attorney Blake Parker. Thompson testified at the hearing, and Vocational Expert ("VE") G. Brian Paprocki also testified.

On May 20, 2005, the ALJ ruled Thompson was not entitled to benefits. Thompson appealed the ALJ's ruling, and on September 7, 2005, the Appeals Council denied Thompson's request for review, making the ALJ's decision the final decision of the Commissioner.

Thompson filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. On January 20, 2006, with the parties' consent, Chief Judge Mark W. Bennett transferred the case to the undersigned for final disposition and entry of judgment. Thompson filed a brief supporting his claim on February 8, 2006. The Commissioner filed a responsive brief on April 3, 2006. Thompson filed a reply brief on April 12, 2006. The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Thompson's claim for benefits.

### B.  Factual Background

### 1.  Introductory facts and Thompson's hearing testimony

Thompson was born in 1963, and was forty-one years-old at the time of the hearing. He completed the ninth grade, and has a GED. He is married, and lives with his wife and four-year-old daughter. He last worked April 1, 2002, as a small engine mechanic. Before that, he drove a cement truck. He also has worked as an oiler, construction worker, and farm worker.

Thompson testified he has had three surgeries on his back and neck.  He takes prescription medications for pain, but they cause him to be sleepy and lose concentration.  He falls asleep three to four times a day.  At night, he can sleep for only three to four hours at a time.

During a normal day, Thompson tries to keep moving so he will not get stiff or numb.  He testified he is unable to do much, but he helps with the dishes, does some vacuuming, folds clothes, and picks up.  He used to do home repairs, but that "came to a screeching halt."  He also used to change the oil in his car, but stopped about a year before the hearing because he could not get the filter off.  He sometimes walks around a little bit, but then he sits down.  Thompson testified he can sit for a half-hour at a time, and he can walk for between twenty and thirty minutes at a time.

Thompson's neck "feels like a ball of tinfoil crunching every time [he] move[s] [his] neck around."  Sometimes, when he moves his neck, he will feel it catch.  It tingles like when he hits his funny bone and he sees stars.  His lower back feels like pins and needles that stab all the time through his legs and across his hips.  His arms will go to sleep and tingle to the point he cannot use his hands.  He has difficulties concentrating because of the pain.

### 2.    *Thompson's medical history*

On December 2, 1997, Thompson underwent a C3 through C7 laminectomy.  The surgery went well, and he was discharged from the hospital on December 5, 1997.  Five weeks after the surgery, his surgeon felt Thompson had "excellent result from the surgical laminectomy."

On November 30, 1998, Thompson stepped in a hole while carrying some chutes for cement and injured his back.  He underwent a bilateral hemilaminectomy, diskectomy, and foraminotomy at L4-L5 and L5-S1.  When he was discharged from the hospital, he

was suffering from right lateral thigh and hip pain and tingling in the right lower extremity. By January 22, 1999, he was doing "quite well," but on February 23, 1999, after a fall at home, he had increased back pain. Over the following months, the pain continued, primarily in his lower back.

An MRI of his lumbar spine on November 4, 1999, showed central herniations of the L4-L5 and L5-S1 discs, without significant defacement of the thecal sac at those levels. X-rays and an MRI of his lumber spine on July 19, 2001, showed degenerative disc disease involving the L4-L5 and L5-S1 discs with herniation of the nucleus of the L4-L5 disc centrally, compression to the thecal sac and nerve root sleeve, and a large amount of granulation leading to spinal stenosis and compression of the thecal sac at L4-L5. X-rays of his cervical spine on June 10, 2002, showed degenerative disc disease involving the C5-C6 and C6-C7 discs; anterior and posterior degenerative spur formation of C5, C6, and C7, with moderate occlusion of intervertebral foramina bilaterally by the posterior spurs at the level of C5-C6, but severe occlusion at the level of the C6-C7 disc spaces; and facet joint arthritis from C2 through C7. An MRI of his cervical spine on the same date showed degenerative disc disease involving the C3-C4, C4-C5, C5-C6, and C6-C7 discs, with a very large herniation of the nucleus of the C5-C6 discs with compression to the ventral portion of the cervical spinal cord; spinal stenosis at the level of the C4-C5, C5-C6, and C6-C7 discs; posterior spur formations of C3, with narrowing of the neural foramen on the right, and posterior spurs of C5 and C6, with bilateral neural foraminal narrowing and posterior spur of C7 with narrowing of the right neural foramen; and spinal stenosis at the level of the C4-C5, C5-C6, and C6-C7 discs.

In a Residual Functional Capacity Assessment performed on March 28, 2001, a non-examining Disability Determination Services consultant opined Thompson could occasionally lift or carry fifty pounds, and frequently lift or carry twenty-five pounds. He

could stand or walk for six hours in an eight-hour workday. He had no other limitations. Another DDS consultant agreed with these findings on June 4, 2001.

On June 24, 2002, Thompson sought emergency room treatment for loss of feeling on the right side of his face, and right shoulder pain radiating to his neck and hand. He was treated with a Medrol dose pack and Celebrex.

On August 9, 2002, Thompson was evaluated by a neurologist at the University of Iowa for neck pain, right arm pain, right arm numbness, and clumsiness in his legs. The neurologist decided "it would be reasonable to proceed with an anterior diskectomy and fusion."

On August 29, 2002, Thompson "underwent a C5-6 anterior cervical diskectomy and fusion with allograft and instrumentation." He tolerated the procedure without difficulty, and was discharged on August 31, 2002. On October 30, 2002, Thompson returned to the University of Iowa, and reported that his condition had not improved. Spine films showed good alignment of the graft construct.

Thompson had trigger point injections on November 27, 2002, and a cervical epidural steroid injection on December 10, 2002.

On February 28, 2003, Thompson had a pain management evaluation by Marco C. Araujo, M.D. at Trinity Regional Medical Center. Thompson was complaining mainly of low back pain that caused him difficulty with standing up for a prolonged period of time. The treating physician's impression was as follows:

> This is a 40-year-old male with failed back surgery syndrome. He has come in today for re-evaluation of his lower back. Patient states that he has generalized back pain with worsening in his hips and lower back. Patient has been taking Nortriptyline 50 mg every day, Darvocet eight pills a day and Flexeril. The patient has benefits most from Baclofen plus patient has been developing an opiate hyperalgesia. Patient was instructed to start Baclofen 10 mg t.i.d. and then increase to 10, 10 and 20 mg at bedtime. Adding Baclofen to

Nortriptyline may have most of the benefits. We will also be able to provide a good night of sleep for the patient. Patient will be seen within a month. We will try to optimize his no opiate management. The patient will also benefit from a facet joint injection. Will start on the right side.

After a further consultation on March 28, 2003, Dr. Araujo listed the following problems:

1.    Status post anterior cervical fusion.
2.    Status post lumbar laminectomy with persistent right foot paresthesia and right medial thigh paresthesia.
3.    History of alcohol abuse, status post alcohol detoxification on 8/13/02.

Thompson told the doctor he was getting better relief of his symptoms from the Baclofen, but he reported low back pain, right foot pain, improved range of motion of his lumbosacral spine, and improvement in his sleep cycles. Dr. Araujo's impression was that Thompson was "a 39-year-old male status post anterior cervical fusion and lumbar laminectomy with persistent low back pain and right leg pain."

On April 4, 2003, Nabil T. Khoury, M.D. prepared a comprehensive examination report for Disability Determination Services. Dr. Khoury took the following history:

Mr. Thompson has been suffering from neck and lower back pains, he states having these pains since 1997-1998 and he has been operated twice on his neck and once on his back. He is currently complaining of neck pain, radiating to his right upper extremity, cubital side, accompanied with numbness and decrease in the sensation of the same side[;] this pain is present daily and worsens with head movements. He is also complaining of low back pains, aggravated by standing, sitting, lying, bending, lifting and coughing, which restricts significantly his daily activities[;] this pain radiates to his right lower extremity, with numbness and some loss of sensation especially of his right toes. Those pains have been treated with multiple medications with moderate help.

Dr. Khoury's assessment was "(1) Severe Cervical Spine degenerative joint disease S/P Surgery, [and] (2) Severe lumbar spine degenerative joint disease S/P Surgery." He concluded Thompson would not be able to return to his previous job, and he was "very limited in jobs that require prolonged walking, standing, and sitting." The doctor also concluded Thompson's "ability to perform working activities such as carrying, lifting, stooping, climbing and kneeling for even short periods of time is restricted by pain," and his "ability to handle objects by his hands is not limited significantly." Dr. Khoury did not reach any other conclusions about Thompson's functional capacity, stating he would leave Thompson's "functional capacities evaluation to your current guidelines."

On April 9, 2003, Thompson underwent a lumbar epidural steroid injection. During a follow up on July 22, 2003, he complained to Dr. Araujo that the procedure had aggravated his symptoms. He also complained of cervical, facial, and low back pain, with right leg paresthesia; right cheek numbness and dysesthesia; and right anterior thigh dysesthesia. He reported improvement of his muscle spasms from the use of Baclofen. Dr. Araujo advised Thompson that cervical epidural steroid injections and lumbar epidural steroids would not provide long-standing relief.

In a Residual Functional Capacity Assessment form completed on June 12, 2003, a non-examining Disability Determination Services consultant indicated Thompson could occasionally lift or carry twenty pounds, and frequently lift or carry ten pounds. He could stand or walk for two hours in an eight-hour workday. He could sit, with normal breaks, for about six hours in an eight-hour workday. He had occasional postural limitations, but no other limitations.

On August 13, 2003, Thompson reported to Dr. Araujo that he had suffered a head trauma when he hit his head against the floor, and his neck pain had been aggravated since then. He also reported that his balance had been affected. On October 7, 2003, Thompson reported "good improvement of his symptoms with his current pain schedule."

On November 26, 2003, he reported that his pain "feels worse in his neck and radiates to both upper extremities, left greater than right," with pain radiating down his lower extremities. He rated his pain at 9 on a 10-point scale, although he had been sleeping well at night.

On December 3, 2003, Thompson saw Dr. Araujo for followup. Dr. Araujo took the following history:

> The patient has been on chronic opioid maintenance therapy, Nortriptyline, and Baclofen with good relief of his symptoms. Patient comes in today for refill of his medications and re-evaluation. Patient states he has been unable to take care of his children. He is unable to hold his 3-year-old child due to arm weakness and numbness. Patient has been off work for approximately two years, but he would like to return to work. Recent urine screen revealed tricyclics and benzodiazeprines as expected, but did not detect any opioids. The urine screen was negative for alcohol this time. Last urine screen done on 11/26/03 was positive for alcohol, but was still negative for opioids.

Dr. Araujo stated his "major concern is a negative urine drug screen for opioids despite the use of a Fentanyl patch . . . and Darvocet . . . . Patient states he has been taking his medications and denies any side effects." On December 30, 2003, Thompson again saw Dr. Araujo, and Thompson again tested negative for opioids even though he was taking Darvocet and a Fentanyl patch. Dr. Araujo against stated this was a "major concern."

On February 11, 2004, an Evaluation Report was prepared by the Iowa Central Industries Assessment Center. The evaluator concluded that if Thompson were to hold a job, "it may need to be carved to the duties that he can tolerate, with the number of hours that he could handle. He would need to work on a sedentary job that would allow him to get up and stretch as needed. He probably would need to work less than two hours a day."

Thompson saw Dr. Araujo again on February 25, 2004, with decreased back and hip pain, but complaining of paresthesias in both legs that radiated down to both feet.

Upon examination, he had better range of motion of his cervical spine. Thompson continued to complain of pain in his neck, back, and legs in regular visits with Dr. Araujo through October 14, 2004.

On December 13, 2004, Dr. Araujo completed a Residual Functional Capacity Questionnaire on Thompson. He stated Thompson could walk one city block without rest. He could sit for thirty minutes at a time before he would need to get up. He could stand for ten minutes before needing to sit down or walk around. He would be required to walk around every twenty to thirty minutes in an eight-hour day, for five minutes each time. He would need to take unscheduled breaks every thirty minutes to two hours during an eight-hour day, and would have to rest five to ten minutes before returning to work. He occasionally could lift less than ten pounds. He could never twist or stoop, rarely could crouch or climb ladders, and occasionally could climb stairs. He also would be limited significantly in doing repetitive reaching, handling, or fingering. His impairments would produce "good days" and "bad days," causing him to be absent from work about four days per month.

### 3.    *Vocational expert's testimony*

The ALJ asked the VE the following hypothetical question:

> The first hypothetical would . . . limit lifting to 10 pounds frequently, 20 occasionally. Stand up to two hours in an eight hour work day and sit six hours in an eight hour work day. No climbing of ladders, occasional climbing of stairs, frequent only exposure to hazards. If we assume the claimant has this residual functional capacity could any of his past relevant work be done either as he did it or as it is customarily performed in the national economy?

The VE answered that the hypothetical individual would be unable to return to Thompson's past work, and would have no transferable skills with these restrictions. However, he testified that an individual the same age, and with the same education and work experience

as Thompson, with this residual functional capacity, would be able to perform a number of sedentary jobs, such as fishing reel assembler and sedentary inspector and checker.

The ALJ then asked the VE a second hypothetical question:

> Second hypothetical would be the same as number one but pursuant to the RFC submitted by Dr. [ ]Araujo. Would miss three or more days a month, with that additional would that eliminate the other jobs?

The VE answered that the individual would be precluded from all competitive employment.

The ALJ then asked the VE a third hypothetical question:

> [M]y third hypothetical[.] We'll limit the lifting to 10 pounds frequently and occasionally, 30 minutes standing at a time, 30 minutes sitting at a time. No stooping, occasional crouching and climbing, occasional gross and fine manipulation. Frequent on exposure to cold. If I – and no ladders, no climbing of ladders. And frequent on exposure to the hazards. With those restrictions would an individual the same age, educational experience as the claimant be able to perform any jobs?

The VE answered that the individual could only work as a security monitor, and there would be 300 such jobs statewide.

The ALJ then asked the VE a fourth hypothetical question: "[T]he same as [hypothetical] number three, plus unable to sustain an eight-hour work day to go along with the idea of working just a part-time basis." The VE testified that if the individual were unable to sustain eight hours of work a day, he would not be able to work at a full-time job.

Thompson's attorney then had the following exchange with the VE:

> Attorney: I want you to assume an individual who is age 35 with an education consistent with that of the claimant, past relevant work as you have identified. This person is able to lift no more than 10 pounds. He has some very restrictive movement in his neck and lower back resulting in no stairs, no climbing of ropes or ladders, and all of this is coming to add in the concept of the claimant's medication, so inability to concentrate for any

period of time secondary to his use of pain medication. Would that individual be able to return to any of his past relevant work?

ALJ: I wonder if we could get clarification as to what we mean by inability to concentrate, that could be stated in terms of a functional limitation.

Attorney: Okay. I think I can do that. Is able to concentrate no longer than 30 minutes of time and following that 30 minutes of time is no longer able to attend to whatever he is directed to do.

ALJ: Is that put into the vocational restrictions you can deal with, Mr. Paprocki?

VE: How long would he be unable to concentrate before being able to return to a job?

ALJ: What's your answer to that, Mr. Parker, in the hypothetical?

Attorney: He would have to move and stretch for at least two to three minutes.

ALJ: Are we then talking about he'd have to take unscheduled rest breaks for two to three minutes every 30 minutes?

Attorney: I guess that's what I'm talking about.

ALJ: Okay.

VE: I think that probably is excessive in terms of assuming that a normal employer would be able to accommodate that. If you're looking at two or three minutes every 30 minutes you're looking at six minutes an hour, you're looking at nearly an hour collectively during the day that the person would be unable to attend to the job in addition to the regularly scheduled breaks and lunch period, I'm assuming you're considering. That's really just too much time to lose during the day to be able to assume that the employer would anticipate the employee being able to do as well as there may be some problem in terms of work quality as well, starting and stopping a job.

Attorney: Okay. Would there be other jobs that the hypothetical individual would be able to do?

VE: No[.]

The VE also testified that if the individual fell asleep three to four times a day secondary to the use of pain medications, he would not be able to work as a security monitor.

### 4.    *The ALJ's decision*

The ALJ found Thompson suffers from the following impairments:   "severe degenerative disc disease and degenerative joint disease and stenosis of the cervical and lumbosacral spine."   He further found these impairments do not satisfy the criteria of the Listings.

The ALJ then considered Thompson's overall credibility.   He found Thompson had work activity after his alleged disability onset date, indicating his daily activities were, at least at times, somewhat greater than what he had reported.   Thompson admitted he sometimes would assist with household chores, such as vacuuming.   The ALJ found Thompson "admitted to certain abilities which provide support for part of the residual functional capacity conclusion in this decision," although in his decision, the ALJ did not identify what those abilities were.   The ALJ also found there was "a gap in the claimant's history of treatment," although, again, he did not identify this gap in treatment, and the court can find none.   The ALJ noted the unresolved issue regarding Thompson's medication compliance evidenced by the negative laboratory tests.   The ALJ also noted the "residual functional capacity conclusions reached by the physicians employed by the Disability Determination Services also supported a finding of 'not disabled.'"   Based on this evidence, the ALJ found Thompson had been "less than credible regarding his allegation that he is totally disabled."

The ALJ found Thompson retains the residual functional capacity to lift ten pounds occasionally and frequently; stand for thirty minutes at a time; sit for thirty minutes at a time; crouch and climb occasionally; and handle and finger occasionally.   Based on these findings, the ALJ concluded Thompson cannot perform his past relevant work.   However,

according to the ALJ, Thompson is able to work as a surveillance system monitor, of which there are 300 positions in Iowa and 24,000 positions nationwide.

### III.  DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

#### A.  Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505.  A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations.  20 C.F.R. §§ 404.1520 & 416.920; *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing *Ingram v. Chater*, 107 F.3d 598, 600 (8th Cir. 1997)).  First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353

F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC,

but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

## B. *The Substantial Evidence Standard*

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003); *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001) (citing *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)); *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline v. Sullivan*, 939 F.2d 560, * (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91,

99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier*, 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *Baldwin*, 349 F.3d at 555 (citing *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir. 1997)); *Young*, 221 F.3d at 1068; *see Pearsall*, 274 F.3d at 1217; *Gowell*, 242 F.3d at 796; *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not

discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)      the claimant's daily activities;
> 2)      the duration, frequency and intensity of the pain;
> 3)      precipitating and aggravating factors;
> 4)      dosage, effectiveness and side effects of medication;
> 5)      functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## IV. ANALYSIS

Thompson asserts that the ALJ's hypothetical questions to the VE were not based on substantial evidence, and therefore the resulting responses cannot constitute substantial evidence to support a denial of Thompson's application for DI benefits. The ALJ based his decision on his third hypothetical question, in which he posited that Thompson could lift up to ten pounds frequently and occasionally, stand for thirty minutes at a time, sit for thirty minutes at a time, and perform occasional gross and fine manipulation.

In order to reach these conclusions, the ALJ was required to ignore Thompson's testimony at the ALJ hearing.  The reasons the ALJ gave for doing so are not persuasive.  He found Thompson had engaged in work activity after his alleged disability onset date, but the ALJ does not indicate what that work might be, except to point out that Thompson occasionally did some vacuuming.  As the Eighth Circuit Court of Appeals has noted repeatedly, the appropriate inquiry is whether substantial evidence in the record as a whole supports the ALJ's findings that a claimant can perform "'the requisite physical acts day in and day out, in the sometime competitive and stressful conditions in which real people work in the real world.'"  *Shaw v. Apfel*, 220 F.3d 937, 939 (8th Cir. 2000) (quoting *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982)).  Further,

> [A]n SSI claimant need not prove that she is bedridden or completely helpless to be found disabled and the fact that claimant cooks and cleans for herself, shops for groceries, does laundry, visits friends, attends church, and goes fishing does not in and of itself constitute substantial evidence that a claimant possesses the residual functional capacity to engage in substantial gainful activity.

*Cline* , 939 F.2d at 566 (citing *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989)

The ALJ also found Thompson had "admitted to certain abilities which provide support for part of the residual functional capacity conclusion in this decision."  However, the ALJ did not identify what those abilities were.  The ALJ commented that there was "a gap in the claimant's history of treatment," but the court can identify no such gap in treatment.

The ALJ also noted the "residual functional capacity conclusions reached by the physicians employed by the Disability Determination Services also supported a finding of 'not disabled.'"  This statement is misleading.  The first residual functional capacity review was conducted by non-treating DDS-employed physicians in March 2001, before the third surgery on Thompson's spine in August 2002.  An evaluation was performed by one of Thompson's treating physicians, Dr. Khoury, in April 2003, and he concluded

Thompson was "very limited in jobs that require prolonged walking, standing, and sitting," and his "ability to perform working activities such as carrying, lifting, stooping, climbing and kneeling for even short periods of time is restricted by pain." The next residual functioning capacity assessment was performed in June 2003, by a different non-examining DDS consultant who concluded Thompson could occasionally lift or carry twenty pounds, and frequently lift or carry ten pounds; he could stand or walk for two hours in an eight-hour workday; he could sit, with normal breaks, for about six hours in an eight-hour workday; and he would have occasional postural limitations, but no other limitations. On February 11, 2004, an Evaluation Report was prepared by the Iowa Central Industries Assessment Center. The evaluator concluded that if Thompson were to hold a job, "it may need to be carved to the duties that he can tolerate, with the number of hours that he could handle. He would need to work on a sedentary job that would allow him to get up and stretch as needed. He probably would need to work less than two hours a day."

Finally, and most significantly, on December 13, 2004, Dr. Araujo completed a Residual Functional Capacity Questionnaire on Thompson His conclusions were as follows: Thompson can walk one city block without rest, sit for thirty minutes at a time before he must get up, and stand for ten minutes before he needs to sit down or walk around. He is required to walk every twenty to thirty minutes in an eight-hour day, for five minutes each time; and he must take unscheduled breaks every thirty minutes to two hours during an eight-hour day, resting each time for five to ten minutes before returning to work. He occasionally can lift less than ten pounds. He can never twist or stoop, rarely can crouch or climb ladders, and only occasionally can climb stairs. He also is significantly limited in doing repetitive reaching, handling, or fingering. According to Dr. Araujo, Thompson's impairments will produce "good days" and "bad days," causing him to be absent from work about four days per month.

There is nothing in the record to support the conclusions of the DDS physicians. On the other hand, the record contains ample evidence to support the opinions of Dr. Araujo. "The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence," particularly where the opinion is not supported by the objective medical evidence. *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998). In *Prosch v. Apfel*, 201 F.3d 1010 (8th Cir. 2000), the Eighth Circuit Court of Appeals discussed the weight to be given to the opinions of treating physicians:

> The opinion of a treating physician is accorded special deference under the social security regulations. The regulations provide that a treating physician's opinion regarding an applicant's impairment will be granted "controlling weight," provided the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2). Consistent with the regulations, we have stated that a treating physician's opinion is "normally entitled to great weight," *Rankin v. Apfel*, 195 F.3d 427, 430 (8th Cir. 1999), but we have also cautioned that such an opinion "do[es] not automatically control, since the record must be evaluated as a whole." *Bentley v. Shalala*, 52 F.3d 784, 785-86 (8th Cir. 1995). Accordingly, we have upheld an ALJ's decision to discount or even disregard the opinion of a treating physician where other medical assessments "are supported by better or more thorough medical evidence," *Rogers v. Chater*, 118 F.3d 600, 602 (8th Cir. 1997), or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions, *see Cruze v. Chater*, 85 F.3d 1320, 1324-25 (8th Cir. 1996).

> Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must "always give good reasons" for the particular weight given to a treating physician's evaluation. 20 C.F.R. § 404.1527(d)(2); *see also* SSR 96-2p.

*Prosch*, 201 F.3d at 1012-13. The court finds the ALJ gave insufficient reasons for his failure to give Dr. Araujo's opinion great weight.[1]

The record does not, however, support a conclusion that Thompson was disabled on December 15, 1998. Rather, the record establishes that Thompson was disabled as of August 29, 2002, when he had his final, unsuccessful spine surgery. The court finds that sine that time, Thompson has been unable to perform the requisite physical activities required to perform competitive employment.

## V. CONCLUSION

Having found that Thompson is entitled to benefits, the court may affirm, modify, or reverse the Commissioner's decision with or without remand to the Commissioner for a rehearing. 42 U.S.C. § 405(g). In this case, where the record itself "convincingly establishes disability and further hearings would merely delay receipt of benefits, an immediate order granting benefits without remand is appropriate." *Cline*, 939 F.2d at 569 (citing *Jefferey v. Secretary of H.H.S.*, 849 F.2d 1129, 1133 (8th Cir. 1988); *Beeler v. Bowen*, 833 F.2d 124, 127-28 (8th Cir. 1987)); *accord Thomas v. Apfel*, 22 F. Supp. 2d 996, 999 (S.D. Iowa 1998) (where claimant is unable to do any work in the national economy, remand to take additional evidence would only delay receipt of benefits to which claimant is entitled, warranting reversal with award of benefits).

---

[1] The only basis for discrediting Thompson's testimony in the record is the unresolved issue regarding medication compliance evidenced by negative laboratory tests. While this is curious, Dr. Araujo was aware of this conflict in the record, and nevertheless determined that Thompson lacks the residual functional capacity the VE testified would be required for him to be able to work.

Accordingly, for the reasons discussed above, the Commissioner's decision is **reversed**, and this case is **remanded** to the Commissioner to calculate and award benefits from August 29, 2002.

**IT IS SO ORDERED.**

**DATED** this 4th day of December, 2006.

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT